IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| THERESA BUFFINGTON, | ) |  |
|---|---|---|
| Plaintiff | ) | |
| v. | ) | Civ. No. 1:11-cv-229 Erie |
| PEC MANAGEMENT II, LLP d/b/a BURGER KING, | ) | Judge Maurice B. Cohill |
| Defendant | ) | |

## OPINION

Pending before the Court is Defendant's (PEC Management II, LLP d/b/a Burger King, hereinafter, "PEC") Motion for Summary Judgment [PEC's Motion for Summary Judgment at ECF No. 30] pursuant to Rule 56 of the Federal Rules of Civil Procedure and L.R. 56.1 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania.

On October 4, 2011, Theresa Buffington, Plaintiff, (hereinafter "Buffington") filed a Complaint in Civil Action [ECF No. 1] seeking compensatory and punitive damages, as well as costs and attorneys' fees, as a result of being terminated by PEC. Buffington alleges that she was terminated because of her association with a person with a disability, namely her son who had cancer, violating the Americans With Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 120101, et. seq., and the Pennsylvania Human Relations Act, as amended ("PHRA"), 43 P.S. § 951 et. seq.

On December 27, 2011 PEC filed its Answer to Complaint [ECF No. 10]. On January 14, 2010 PEC filed its Motion for Summary Judgment with respect to all of Buffington's disability discrimination claims under the ADA and PHRA claiming there are no genuine issues

as to any material fact, and defendant PEC is entitled to judgment as a matter of law. For the reasons set forth below, Defendant's Motion for Summary Judgment is denied.

**I. Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. See Anderson, 477 U.S. at 255; Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor

with regard to that issue. See id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

**II. Relevant Facts.**

PEC is a franchisee of Burger King Corporation with its headquarters located in Erie, Pennsylvania [PEC's Concise Statement of Material Facts, ECF No. 33, at p. 1]. Buffington was employed by PEC in a restaurant management capacity from December 2003 until November 2010 [Id. at 2]. PEC owns and operates 34 Burger King Restaurants in Western Pennsylvania and Eastern Ohio [Id.]. Keith Egyed ("Egyed") is PEC's Managing Director who has the overall responsibility of operating the 34 Burger King Restaurants [Id.]. There are five district managers who report to Egyed [Id.]. Each Burger King Restaurant generally has four or five managers – one general manager, with the remainder being a combination of salaried assistant managers and hourly shift supervisors [Id.].

Buffington was hired by PEC as a general manager in training in December 2003 [Id. at 3]. A general manager is responsible for "all aspects of the restaurant's operations and performance, such as scheduling, overseeing employees, financial matters, compliance with all Burger King Corporation and PEC standards, ordering and maintaining product and overall ensuring the smooth and profitable operation of the restaurant. The General Manager also has the authority to hire, train and terminate other restaurant level employees [Id. at 2]. Buffington first was the General Manager of the Beaver Falls Burger King, where her District Manager was Jerry Jenkins ("Jenkins") [Id. at 3]. She was transferred from Beaver Falls to the Ellwood City restaurant in June 2006 where her District Manager was Alice Lawrence ("Lawrence") [Id. at 3].

3

Buffington had a son, D.J. Honneffer ("D.J."), who passed away on June 18, 2011 at the age of 14 years old after a 12-year battle with cancer [Id. at 4]. D.J. had a form of cancer called rhabdomyosarcoma, which attacks muscles and bones and over the course of D.J.'s struggle with cancer he had various relapses when the cancer would return and he would have a new tumor that would require surgery and follow up courses of chemotherapy and radiation [Id. at 4]. It is undisputed that PEC managers knew of D.J.'s condition before or as of the time Buffington became an employee of PEC [Id. at 4].

D.J. had a relapse in April 2010 [Pretrial Statement by Buffington, ECF No. 40, at p. 2]. He had surgery in July 2010 [Id.], and continued to receive chemotherapy and radiation treatments following the surgery [PEC Concise Statement of Material Facts, ECF No. 33 at p. 20]. In August 2010, the tumor that could not be removed grew larger [Pretrial Statement by Buffington, ECF No. 40, at p. 2]. D.J. had his last surgery for this relapse in February/March 2011 [Id.]. In October 2010 D.J. suffered another relapse [PEC Concise Statement of Material Facts, ECF No. 33, at p. 26]. He passed away on June 18, 2011 [Pretrial Statement by Buffington, ECF No. 40, at p. 2].

Lawrence noted a decline in Buffington's performance over the summer of 2010 [PEC Concise Statement of Material Facts, ECF No. 33, at p. 12]. During this time there was an exchange of emails and memoranda among Managers regarding Buffington's performance [See id. at 15-17]. In her March 2010 Manager Performance Review, Lawrence gave Buffington an overall rating of "Good minus" [Id. at 10]. Subsequently, Buffington and Lawrence discussed a possible demotion for Buffington if Buffington couldn't "handle the job." [Id. at 19]. Still Buffington contends that she was never documented for "Poor Work Performance" [Buffington

4

Supplement, ECF No. 36, at p. 83].

In the meantime, in July 2010, Egyed learned that a crew member employed at the North East restaurant had been involved in a single vehicle accident while driving her vehicle to another restaurant to borrow product [PEC Concise Statement of Material Facts, ECF No. 33, at p. 28]. As a result, Egyed directed the Human Resources Department to prepare a Memorandum dated August 16, 2010 which was hand delivered to all restaurant managers stapled to their paychecks which stated:

> Please be reminded; the only employees permitted to drive for restaurant business, under any circumstances, are exclusively management employees. Absolutely no crew members are to drive for restaurant business even if accompanied by a management employee.

[Id. at 28-9].

This policy had several different iterations in the Manager Handbook since 2003 [Id. at 28 and 31]. Buffington claims she did not receive the August 16, 2010 Memorandum [Id. at 30].

On November 7, 2010, Buffington was the only manager on duty when she ran out of product called "funnel sticks" at her restaurant [Id. at 31]. Buffington sent an off-duty crew member who had pulled up to the drive-through window, Scott Hayes ("Hayes"), on the errand to deliver tomatoes to, and obtain the funnel sticks from, the Beaver Falls Burger King [Id.]. Hayes punched in on the clock and was sent on the errand in his own vehicle [Id. at 32]. During the errand Hays was involved in a car accident where he claimed that his brakes failed and he rear-ended another vehicle [Id]. Buffington promptly reported the accident to Lawrence [Id.]. Lawrence, in turn, reported the accident to Egyed on Monday, November 8, 2010 [Id. at 33].

On November 12, 2010, Lawrence, accompanied by Jenkins, met with Buffington at the

5

Beaver Falls restaurant and informed her that she was being terminated [Id. at 37]. Lawrence presented Buffington with a termination letter stating, "Based upon ongoing issues related to performance, your employment is being terminated effective immediately." [Id. at 38]. In a March 4, 2011 statement submitted to the Pennsylvania Human Relations Committee ("PHRC"), PEC provided the reason for Buffington's termination as follows:

> Theresa Buffington was terminated for violating the policy of allowing a non-management employee drive for company business. Compounding the violation was the fact that the employee was a minor and had come to the restaurant as a guest using the drive-thru to purchase food. He was then asked to punch in and transport product. Ms. Buffington did not explore any other options that would have been acceptable and consistent with company policy. Ms. Buffington admitted she knew it was not the correct procedure stating that she knew she should have called me, her District Manager. The violated policy is as follows: "Only managers are authorized to run errands while on company time," found on page 15 of the Manager's Handbook. Violation of this policy was the incident which led to the termination.

[Id. at 36-7].

It is undisputed that at the termination meeting Lawrence told Buffington, "the rule violation of sending Scott [Hayes] to run an errand to get product was the straw that broke the camel's back, and because of that rule violation, I had to let her go." [Buffington's Supplement, ECF No. 36, at p. 4]. There are other allegations that Lawrence made statements at the termination meeting such as, "We need someone whose head is there 100 percent," "We are planning on spending 400 grand to remodel the restaurant," "Now you can go spend all your time with your son," and "Please go spend some time with your son." [Id. at pp. 5-6]. The parties do not agree as to which allegations are accurate.

## III. Legal Analysis.

PEC is seeking summary judgment of the case which hinges on the issue of whether

6

Buffington was terminated from her job due to her association with a disabled person, her son D.J., under Americans With Disability Act of 1990, as amended ("ADA"), 42 U.S.C. § 12112 ("Discrimination"):

General Rule

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
>
> (a) Construction
>
> (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

And under the Pennsylvania Human Relations Act ("PHRA") as amended ("PHRA"), 43 P.S. § 951 et. seq.

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
>
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. Ann. § 955 (West)

"[T]he association provision [under the ADA] does not obligate employers to accommodate the schedule of an employee with a disabled relative. Although refusal to 'mak[e] reasonable

accommodations' may constitute illegal discrimination against a disabled employee, [citations omitted], the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 510 (2009). Thus, like in Erdman, the question is whether Buffington has adduced sufficient evidence from which a reasonable jury could infer that PEC terminated her because of her son D.J.'s disability. In order to establish a prima facie case of association discrimination, a plaintiff must prove that: (1) she was in a protected class (i.e., an individual known to have an association or relationship with an individual who has a known disability); (2) she was discharged; (3) at the time of her discharge, she was performing her job at a level that met the employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Stansberry v. Air Wis. Airlines Corp., 651 F.3d 482, 487 (6th Cir. 2011). Plaintiff and Defendant agree that prongs one and two have been met.

Thus, the determinative issue is not whether the plaintiff in a discrimination by association case has requested time off to take care of a disabled person, actually taken time off to care for a disabled person, or had poor work performance due to their association with a disabled person because the employee herself is not the disabled person and therefore does not have a right to be accommodated by the employer. Rather, the legal issue to be addressed is whether the plaintiff was dismissed from her duties by the employer based on unproven assumptions and speculation by the employer of sub-standard work performance by the employee because of the employee's association with a disabled person.

Claims of discrimination based on indirect evidence, as in the case at bar, are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973). Under this standard (1) the plaintiff must make a prima facie showing of discrimination (See Stansberry, above); (2) the defendant must articulate a legitimate, nondiscriminatory reason for the employment action; and (3) the plaintiff is afforded an opportunity to show the defendant's stated reason is merely pretext for discrimination. Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).

### A. The Parties Positions

Under the Stansberry analysis, Buffington believes she has sufficient evidence for a prima facie case of discrimination by association. Namely that she was known by her employer to have an association with a disabled person, that she was discharged from her employment, at the time of discharge she was performing her work at the level of her employer's expectations, and that the circumstances surrounding the discharge raised a reasonable inference of discrimination. As stated previously, it is undisputed that PEC knew Buffington's son, D.J. had a disability. It is also undisputed that Buffington was terminated from her position as General Manager of the Ellwood City Burger King in November of 2010.

With regard to the work performance prong, Buffington asserts that she was performing her duties of General Manager of the Ellwood City Burger King satisfactorily and had no indication from her employer otherwise. Buffington cites to the fact that PEC kept Buffington in the position of General Manager for almost seven years and never disciplined her prior to termination [Buffington's Brief in Opposition to Motion for Summary Judgment, ECF No. 37, at p.7]. Furthermore, PEC gave Buffington pay raises [Id.]. Finally, prior to termination, PEC never gave Buffington any type of written or oral warning for anything relating to her performance during her entire tenure as an employee with PEC [Id.]. In the March 2010 performance review Buffington received all of the top or middle marks out of the 18 categories

9

and zero "Needs Improvement," the lowest mark [Id.]. This all being said, Buffington contends that she was not released due to poor work performance, rather she was fired solely because she violated the Use of Vehicles policy in the Manager's Handbook [Id. at p. 7-8], which in turn Buffington says is pretext for the actual discriminatory reason for dismissal.

PEC asserts that Buffington has not established a prima facie case of discrimination by association because she was not performing her job at a level that met her employer's legitimate expectations and the termination did not occur under circumstances that raise a reasonable inference that her son's disability was a determinative factor in the decision to terminate her employment [PEC's Brief in Support of Motion for Summary Judgment, ECF No. 34, at p. 1-2]. PEC further states that even if Buffington could satisfy the prima facie requirements as stated in Erdman above, she could not demonstrate that PEC's legitimate, non-discriminatory reasons for the termination were pretext for discrimination under the McDonnell Douglas factors [Id. at 2].

PEC asserts that Buffington cannot show that she was meeting PEC's expectations in the way of job performance [Id. at 16]. PEC claims the record is replete with evidence that Buffington was not performing her job to PEC's satisfaction [Id.]. PEC asserts that since late 2009, Buffington's own performance and the performance of the Ellwood City restaurant, which she managed, had been steadily declining [Id.]. PEC measures the performance of a restaurant by collecting data and metrics and analyzing them in comparison to other restaurants and the company as a whole. Feedback is continuously filtered through the corporate level [PEC's Concise Statement of Material Facts, ECF No. 33, at p. 12]. The General Manager of a restaurant is ultimately the person accountable for a restaurant's performance [Id.].

At Buffington's March 2010 Manager Performance Review, which was reviewed with

Buffington on April 5, 2010, Lawrence gave Buffington an overall rating of "Good minus" and pointed out both positive aspects of her performance and a number of areas that needed improvement or were areas of concern [Id.at 10]. Among the concerns and constructive criticism identified in the Manager Performance Review was that Buffington needed to document any crew member who breaks a rule, hold her management team accountable and document when this does not happen, follow up on delegated tasks, stay organized and focused, pay attention to small details, and that with more planning and focus she could meet her goals [Id. at 11]. Between May 16 and October 23, 2010, Buffington had at least three conversations with Lawrence and/or Egyed where Buffington's and her restaurant's performance was discussed, and where discussions about Buffington voluntarily taking a demotion took place [PEC's Brief in Support of Motion for Summary Judgment, ECF No 34, at p. 16]. Egyed in his Supplemental Affidavit [ECF No. 31], enumerates the ways in which Buffington was not performing her job. In addition, attached to Egyed's Affidavit, there is a paper trail which evidences PEC's recognition of what it deems sub-standard performance of Buffington and the Ellwood City restaurant, however, it is not apparent that Buffington was made aware of these communications at the time [Id. at Exhibits]. PEC asserts its position is that it dismissed Buffington for poor work performance up to and including her violation of the Use of Vehicle's Policy in the Manager's Handbook.

With regard to the Use of Vehicle's Policy specifically, Buffington claims that the policy was never enforced and it was common practice for managers to send staff on errands to other restaurants [Buffington's Responsive Concise Statement, ECF No. 36, at p. 86]. Buffington sets forth several comparators where PEC managers or shift supervisors engaged in the same conduct

11

as Buffington in violation of the Use of Vehicle's Policy, who did not have an association with a disabled person, and who were not dismissed for their violation [Buffington's Memorandum of Law in Opposition to Motion for Summary Judgment, ECF No. 37, at p. 17]; See also [Buffington's Responsive Concise Statement, ECF No. 36, at pp. 88-95]. Further, Buffington cites to instances where Lawrence and Egyed assisted staff in transporting product to their cars to run product delivery errands [Id. at 89, paragraphs 71, 75; id. at 91, paragraphs 84, 85; id at 92, paragraph 88; id. at 93, paragraph 93; id. at 94, paragraph 96]. PEC's counter to this is that the District Managers were not aware that the policy was being violated [Id. at 88 and 96], and even if at one time they overlooked the violation since the accident at the North East restaurant Upper Management was serious about strictly enforcing it [PEC's Concise Statement of Material Facts, ECF No. 33, at p. 30]. PEC cites the August 16, 2010 Memorandum issued to all Managers with their paychecks as evidence of their commitment to enforcing the policy [Id.].

The final issue to be considered of whether Buffington has established a prima facie case of discrimination by association with a disabled person is whether her termination occurred under circumstances that would raise a reasonable inference that her son's disability was a determinative factor in her dismissal. Buffington contends that PEC perceived she would miss significant time from work in the future due to the deteriorating condition of her son [Buffington's Memorandum of Law in Opposition to Motion for Summary Judgment, ECF No. 37, at p. 9]. Speculation of this kind would show that PEC relied on unfounded stereotypes or assumptions about the type of care Buffington would need to give her son in the future [Id. at 9-10]. Decision-making based on this kind of thought process would satisfy the fourth prong of Stansberry. To prove this assertion, Buffington cites to the language used in her March 2010

12

review and the statements made by Lawrence at her termination meeting. Namely, in her March 2010 review Lawrence emphasized the importance of Buffington staying "focused," and in her termination meeting Lawrence said, "We need someone whose head is there 100%. You know we're planning on spending 400 grand to remodel the restaurant. And now you can focus on your son. Go home and spend time with your son." [Id. at 12].

Lawrence claims that she did not say anything about needing someone whose head was in the game 100%, nor did she say anything about remodeling the restaurant. Further, PEC states there is nothing in the record that would point to material evidence that her termination was due to discrimination. In fact, PEC had been nothing but supportive of Buffington's circumstances as a result of D.J.'s illness [PEC's Brief in Support of Motion for Summary Judgment, ECF No. 34, at p. 21]. PEC claims the record is clear that Buffington was terminated due to her violation of the Use of Vehicle's Policy [Id.].

If we are to assume that Buffington has established a prima facie case of discrimination by association, we must next consider the McDonnell Douglas factors. PEC claims a valid reason for Buffington's dismissal – the violation of the Manager's Handbook Vehicle Policy. The burden then shifts to Buffington to show that the reason provided by PEC was pretext. Buffington cites the following reasons as proving that PEC's justifications for her dismissal, poor work performance and violation of the Use of Vehicles policy, is pretext for the actual discriminatory reason for her termination: (1) PEC did not enforce its Use of Vehicles Policy against other managers; (2) the "paper trail" amassed by the district and regional managers in anticipation of her dismissal contained language that cast doubt on PEC's stated reason for dismissal; (3) evidence of hiding the decision maker shows pretext; (4) PEC's inconsistent

13

reasons for termination; (5) Lawrence's statements to Buffington in the 2010 review and at the termination meeting [See generally Buffington's Memorandum of Law in Opposition to Motion for Summary Judgment, ECF No. 37].

PEC answers each of Buffington's allegations either by outright denying the allegation or with a different perspective or opinion of how the facts of the case should be interpreted [ See generally PEC's Brief in Support of Motion for Summary Judgment, ECF No. 34; PEC's Reply Brief in Support of Motion for Summary Judgment, ECF No. 45].

**B.  Analysis**

To reiterate what was stated above, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. See Anderson, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). Based on the testimony provided by both parties, we find that there are material issues of fact which would preclude the entry of summary judgment on the issue of discrimination by association.

In particular, it is a disputed issue of material fact whether a reasonable person taking into consideration the evidence presented by both sides would deem Buffington's performance sub-par. This fact is important for determining the third prong of Stansberry as well as the third prong of McDonnell Douglas. PEC contends that there were numerous emails and meetings with Buffington suggesting to her that her performance as General Manager at the Ellwood City Restaurant was not up to standard. Buffington presents as evidence that she was never given a poor performance review, received pay raises, was never disciplined, and was a long-term employee of PEC. She says she never saw the emails between managers discussing her performance. This is a material issue of fact because Buffington's assertion is that she was

discharged not for performance reasons but rather for her association with D.J., her son.

It is a disputed issue of material fact whether a reasonable Manager in Buffington's position should have known and enforced PEC's Use of Vehicle Policy, whereby failure to adhere to the Policy would indicate poor work performance. PEC says the Use of Vehicles Rule was in the Manager's Handbook and for emphasis was sent attached to managers' paychecks in August 2010. In opposition, Buffington presents numerous comparison scenarios where PEC managers sent staff members on vehicle errands and none were terminated or even disciplined. Buffington contends this was regular practice in plain view of district and regional managers. PEC responds by saying that none of the comparators were in a similar enough situation to be a legitimate comparison and that most of the comparisons took place after the letter emphasizing the rule. Therefore, different measures were logical in the given situations. This argument goes to PEC's legitimate cause for discharge and requires a trier of fact to make a determination.

It is a disputed issue of material fact to what the language "a certain direction" and "paper trail" in PEC Managements' emails referred. PEC says it was referring to demotion and transfer as discussed in meetings with Buffington herself. Buffington claims it is evidence pointing to Managements' intent to fire her because of her association with a disabled person due to potential loss of work days.

It is a disputed issue of material fact what Lawrence said to Buffington at her termination meeting. PEC claims that it discharged Buffington because of her violation of the Use of Vehicles Rule in the Manager's Handbook. Buffington claims she was discharged because of her association with her disabled son. Buffington presents as evidence that Lawrence fired her and told her to go spend time with her son. It needs to be determined by a trier of fact whether the

comments made by Lawrence in Buffington's March 2010 review and the comments made at Buffington's termination meeting rise to the level of suspicious circumstances surrounding Buffington's termination that would raise a reasonable inference that her son's disability was a determinative factor in her dismissal.

Related to the comments made by Lawrence to Buffington at her termination meeting, it is an issue of material fact whether Lawrence or Egyed was the decision maker as it goes to pretext. In other words, if Lawrence was indeed the decision-maker as is indicated on the PHRA paperwork and she did indeed make discriminatory comments during the termination meeting then that fact would support the claims made by Buffington. If, however, Egyed was the decision-maker, then Lawrence's comments would hold less impact in supporting Buffington's discrimination claims.

Summary Judgment is not appropriate where such issues of material fact, among other facts the parties dispute, are vital to the factors that would decide a case of discrimination by association.

### C.    The Claim under PHRA

Buffington asserts her discrimination by association claim under the ADA and the PHRA. PEC defends that a claim under PHRA is not appropriate because there is no such action under PHRA. While PHRA contains a general anti-discrimination provision that is similar to the ADA's, the ADA further provides that the term "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 1211(b)(4). [PEC's Brief in Support of Motion for Summary Judgment, ECF No.

16

34, at p. 36]. PHRA does not include the same definition of discriminate. [Id.].

Buffington asserts that PHRA should not be read literally but rather should be read in light of the spirit of the law, which is in consideration of principles of fair employment law. [Buffington's Memorandum of Law in Opposition to Summary Judgment, ECF No. 37, at p. 32]. Buffington cites to several cases that support a liberal reading of PHRA understanding that it is modeled after the ADA and allowing for decisions that are in line with certain legislative goals of the ADA.

This Court agrees that PHRA should be read in light of the spirit of the discrimination laws rather than strictly adhering to the letter of the law. The Court denies summary judgment with respect to Plaintiff's claim under PHRA and Plaintiff's claims shall be considered under the laws of both the ADA and PHRA.

## IV. Conclusion.

Because there are genuine disputes as to material facts, Defendant's Motion for Summary Judgment will be denied. The case shall proceed in consideration of Plaintiff's claims both under Americans With Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 120101, et. seq., and the Pennsylvania Human Relations Act, as amended ("PHRA"), 43 P.S. § 951 et. seq.

An appropriate Order follows.

March 26, 2013

Maurice B. Cohill, Jr.
Senior District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THERESA BUFFINGTON, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civ. No. 1:11-cv-229 Erie |
| ) | |
| PEC MANAGEMENT II, LLP ) | Judge Maurice B. Cohill |
| d/b/a BURGER KING, ) | |
| ) | |
| Defendant ) | |

## ORDER

AND NOW, this 26th day of March, 2013, it is hereby ORDERED, ADJUDGED, and DECREED that PEC Management II, LLP d/b/a Burger King's Motion Summary Judgment [ECF No. 30] is hereby DENIED.

Maurice B. Cohill, Jr.
Senior District Court Judge