IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THERESA BUFFINGTON, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>PEC MANAGEMENT II, LLP )<br>d/b/a BURGER KING, )<br>)<br>Defendant ) | Civ. No. 1:11-cv-229 Erie<br><br>Judge Maurice B. Cohill |

## OPINION

Pending before the Court is Defendant's (PEC Management II, LLP d/b/a Burger King, hereinafter, "PEC" or "Defendant") Motion for Judgment as a Matter of Law ("JNOV") pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Motion for a New Trial pursuant to 59(a) of the Federal Rules of Civil Procedure, and Motion for Findings and Conclusions pursuant to Federal Rules of Civil Procedure Rule 52(a)(1) [ECF No. 105].

On October 4, 2011, Theresa Buffington, Plaintiff, (hereinafter "Buffington" or "Plaintiff") filed a Complaint in Civil Action [ECF No. 1] seeking compensatory and punitive damages, as well as costs and attorneys' fees, as a result of being terminated by PEC. Buffington alleged that she was terminated because of her association with a person with a disability, namely her son who had cancer, violating the Americans With Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101, et. seq., and the Pennsylvania Human Relations Act, as amended ("PHRA"), 43 Pa .Stat. Ann. § 951 et. seq.

On December 27, 2011 PEC filed its Answer to the Complaint [ECF No. 10]. On January 14, 2013 PEC filed its Motion for Summary Judgment with respect to all of Buffington's disability discrimination claims under the ADA and PHRA [ECF No. 30]. Buffington filed her

opposition to Summary Judgment on February 14, 2013 [ECF No. 37]. The Court denied Defendant's Motion for Summary Judgment on March 27, 2013 [ECF No. 47]. A trial was conducted on October 8, 9, 10, 15, 16, 17, and 18, 2013 culminating in a jury verdict in favor of Plaintiff in the amount of front pay damages of $115,000.00 and in the amount of compensatory damages of $70,000 [ECF No. 101]. Parties stipulated to back pay damages of $43,156.06 [ECF No. 117].

During the trial, Defendant moved the Court for Judgment as a Matter of Law at the close of Plaintiff's case and at the close of trial [ECF No. 124-3 at 218] stating, "I see no basis for a reasonable jury to conclude that plaintiff's association with her disabled son was the determinative factor in the termination of [P]laintiff's employment." The Court denied both motions [ECF No. 124-3].

Defendant has now filed a Renewed Motion for Judgment as a Matter of Law [ECF No. 105] and supporting brief [ECF No. 132]. Buffington filed a Response in Opposition [ECF No. 138]. For the reasons stated below, we will once again deny PEC's Motion for Judgment as a Matter of Law and deny PEC's Motion for a New Trial. The grounds for Defendant's Motions for JNOV and new trial are identical. Accordingly, these motions will be discussed in tandem.

**I. Standard of Review.**

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

> **(1)** allow judgment on the verdict, if the jury returned a verdict;
> **(2)** order a new trial; or
> **(3)** direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (1) resolve the issue against the party; and (2) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. See Fed. R. Civ. P. 50.

A motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving the non-movant advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability. See Lightening Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). The Court must "refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." Marra v. Phila Hous. Auth., 497 F.3d 286, 300 (3d. Cir. 2007) (citations omitted). The standard for granting judgment as a matter of law "mirrors" the standard for summary judgment, such that "the inquiry under each is the same." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000). The question that the District Court must decide "is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." Lightening Lube, 4 F.3d at 1166. "The relevant inquiry upon a motion for JNOV is whether, in the court's judgment, the jury's verdict was supported by substantial evidence." Dragan v. L.D. Caulk Co., Div. of Dentsply Int'l, Inc., No.

3

84-707-JJF, 1989 WL 133536, at *3 (D. Del. Apr. 21, 1989) aff'd, 897 F.2d 538 (Fed. Cir. 1990). "'Substantial evidence' has been defined as relevant evidence from the record which, when reviewed as a whole, would reasonably support the jury findings under review." Id. (quoting Perkin-Elmer Corp. v. Comptervision Corp., 732 F.2d 888, 893 (Fed.Cir.) cert denied, 469 U.S. 857 (1984).

The Court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Grazier v. City of Philadelphia, 328 F.3d 120, 128 (3d Cir. 2003) (citations omitted).

> **(a) In General.**
> **(1) *Grounds for New Trial.*** The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:
> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court.

Fed. R. Civ. P. 59

In deciding to grant a motion for a new trial, a Court should not "replace the jury's view of evidence for its own." Shaw v. Cumberland Truck Equipment Co., No. 1:09-CV-359, 2012 WL 1078958, at *3 (M.D. Pa. Mar. 30, 2012). "District courts will generally grant such a motion only if some grievous error occurred during trial which rendered the trial unfair. In addition, some prejudice to the moving party should be shown." Dragan, 1989 WL 133536, at *3.

## II. Relevant Facts.

PEC is a franchisee of Burger King Corporation with its headquarters located in Erie, Pennsylvania [ECF No. 33 at 1]. Keith Egyed ("Egyed") is PEC's Managing Director who has the overall responsibility of operating the 34 Burger King Restaurants [ECF No. 33 at 1]. There

4

are five district managers who report to Egyed [ECF No. 33 at 1]. Each Burger King Restaurant generally has four or five managers and one general manager, with the remainder being a combination of salaried assistant managers and hourly shift supervisors [ECF No. 33 at 1].

Buffington was hired by PEC as a general manager in training in December 2003 [ECF No. 33 at 3]. Buffington was the General Manager of the Beaver Falls Burger King, where her District Manager was Jerry Jenkins ("Jenkins") [ECF No. 33 at 3]. She was transferred from Beaver Falls to the Ellwood City restaurant in June 2006 where her District Manager was Alice Lawrence ("Lawrence") [ECF No. 33 at 3]. Buffington was employed by PEC in a restaurant management capacity from December 2003 until November 2010 [ECF No. 33 at 2].

> The restaurant General Manager is responsible for all aspects of the restaurant's operations and performance, such as scheduling, overseeing employees, financial matters, compliance with all Burger King Corporation and PEC standards, ordering and maintaining product and overall ensuring the smooth and profitable operation of the restaurant. The General Manager also has the authority to hire, train, and terminate other restaurant level employees.

[ECF No. 33 at 2].

Buffington had a son, D.J. Honneffer ("D.J."), who passed away on June 18, 2011 at the age of 14 years old after a 12-year battle with cancer [ECF No. 33 at 4]. D.J. had a form of cancer called rhabdomyosarcoma, which attacks muscles and bones. Over the course of D.J.'s struggle with cancer he had various relapses. The cancer would return in the form of a new tumor that would require surgery and follow up courses of chemotherapy and radiation [ECF No. 33 at 4]. It is undisputed that PEC managers knew of D.J.'s condition before or as of the time Buffington became an employee of PEC [ECF No. 33 at 4].

D.J. had a relapse in April 2010 [ECF No. 40 at 2]. He had surgery in July 2010 [ECF No. 40 at 2] and continued to receive chemotherapy and radiation treatments following the surgery [ECF No. 33 at 20]. In August 2010, the tumor that could not be removed grew larger [ECF No. 40 at 2]. In October 2010, D.J. suffered another relapse [ECF No. 33 at 26]. D.J. had his last surgery for this relapse in February/March 2011 [ECF No. 40 at 2]. He passed away on June 18, 2011 [ECF No. 40 at 2].

Lawrence noted a decline in Buffington's performance over the summer of 2010 [ECF No. 33 at 12]. During this time there was an exchange of emails and memoranda among Managers regarding Buffington's performance [See ECF No. 33 at 15-17]. In her March 2010 Manager Performance Review, Lawrence gave Buffington an overall rating of "Good minus" [ECF No. 33 at 10]. Subsequently, Buffington and Lawrence discussed a possible demotion for Buffington if Buffington couldn't "handle the job." [ECF No. 33 at 19]. Still, Buffington contends that she was never documented for "Poor Work Performance" [ECF No. 36 at 83].

In the meantime, in July 2010, Egyed learned that a crew member employed at the North East restaurant had been involved in a single vehicle accident while driving her vehicle to another restaurant to borrow product [ECF No. 33 at 28]. As a result, Egyed directed the Human Resources Department to prepare a Memorandum dated August 16, 2010 that was to be hand delivered to all restaurant managers stapled to their paychecks, which stated:

> Please be reminded; the only employees permitted to drive for restaurant business, under any circumstances, are exclusively management employees. Absolutely no crew members are to drive for restaurant business even if accompanied by a management employee.

[ECF No. 33 at 28-9].

This policy had several different iterations in the Manager Handbook since 2003 [ECF No. 33 at 28 and 31]. Buffington claims she did not receive the August 16, 2010 Memorandum [ECF No. 33 at 30].

On November 7, 2010, Buffington was the only manager on duty when she ran out of product called "funnel sticks" at her restaurant [ECF No. 33 at 31]. Buffington sent an off-duty crew member who had pulled up to the drive-through window, Scott Hayes ("Hayes"), on the errand to deliver tomatoes to, and obtain the funnel sticks from, the Beaver Falls Burger King [ECF No. 33 at 31]. Hayes punched in on the clock and was sent on the errand in his own vehicle [ECF No. 33 at 32]. During the errand, Hays was involved in a car accident where he rear-ended another vehicle [ECF No. 33 at 32]. Buffington promptly reported the accident to Lawrence [ECF No. 33 at 32]. Lawrence, in turn, reported the accident to Egyed on Monday, November 8, 2010 [ECF No. 33 at 33].

On November 12, 2010, Lawrence, accompanied by Jenkins, met with Buffington at the Beaver Falls restaurant and informed her that she was being terminated [ECF No. 33 at 37]. Lawrence presented Buffington with a termination letter stating, "Based upon ongoing issues related to performance, your employment is being terminated effective immediately." [ECF No. 33 at 38]. In a March 4, 2011 statement submitted to the Pennsylvania Human Relations Commission ("PHRC"), PEC provided the reason for Buffington's termination as follows:

> Theresa Buffington was terminated for violating the policy of allowing a non-management employee drive for company business. Compounding the violation was the fact that the employee was a minor and had come to the restaurant as a guest using the drive-thru to purchase food. He was then asked to punch in and transport product. Ms. Buffington did not explore any other options that would have been acceptable and consistent with company policy. Ms. Buffington admitted she knew it was not the correct procedure stating that she knew she should have called me, her

7

District Manager. The violated policy is as follows: "Only managers are authorized to run errands while on company time," found on page 15 of the Manager's Handbook. Violation of this policy was the incident which led to the termination.

[ECF No. 33 at 36-7].

Lawrence, in her deposition, testified that during the termination meeting she told Buffington, "the rule violation of sending Scott [Hayes] to run an errand to get product was the straw that broke the camel's back, and because of that rule violation, I had to let her go." [ECF No. 36 at 4]. There are other allegations that Lawrence made statements at the termination meeting such as, "We need someone whose head is there 100 percent," "We are planning on spending 400 grand to remodel the restaurant," "Now you can go spend all your time with your son," and "Please go spend some time with your son." [ECF No. 36 at 5-6].

### III. Legal Analysis.

PEC seeks to have the Court overturn the jury verdict, which was in favor of Buffington. In the alternative, PEC seeks a new trial. It is PEC's contention that "[T]he evidence at trial, when viewed in a light most favorable to Buffington, was legally and factually insufficient for the jury to reasonably find liability under the applicable legal standards." [ECF No. 132 at 2.]. Buffington's response, generally, is that all of PEC's allegations are issues of fact, and the jury was charged as fact-finder. The Court may not overturn the jury's verdict as a matter of law when the issues are factual and a reasonable jury could come to the same conclusion as the jury that was charged at the Buffington trial.

This case hinges on the legal issue of whether Buffington was terminated from her job due to her association with a disabled person, her son D.J., under the Americans With Disability Act of 1990, as amended ("ADA"), 42 U.S.C. § 12112 ("Discrimination"):

**General Rule**

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

**(a)    Construction**

>   **(4)** excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

And under the Pennsylvania Human Relations Act ("PHRA") as amended ("PHRA"), 43 Pa. Stat. Ann. § 951 et. seq.

>   It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
>
>   (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. Ann. § 955 (West)

"[T]he association provision [under the ADA] does not obligate employers to accommodate the schedule of an employee with a disabled relative. Although refusal to 'mak[e] reasonable accommodations' may constitute illegal discrimination against a disabled employee, [citations omitted], the plain language of the ADA indicates that the accommodation requirement does not

9

extend to relatives of the disabled." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 510 (3d Cir. 2009). Thus, like in Erdman, the question is whether Buffington has adduced sufficient evidence from which a reasonable jury could infer that PEC terminated her because of her son D.J.'s disability. In order to establish a prima facie case of association discrimination, a plaintiff must prove that: (1) she was in a protected class (i.e., an individual known to have an association or relationship with an individual who has a known disability); (2) she was discharged; (3) at the time of her discharge, she was performing her job at a level that met the employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. See Stansberry v. Air Wis. Airlines Corp., 651 F.3d 482, 487 (6th Cir. 2011). The legal issue to be addressed is whether the plaintiff was dismissed from her duties based upon unproven assumptions and speculation by the employer because of the employee's association with a disabled person. For our purposes now, we must determine whether the circumstances surrounding Buffington's dismissal could have led a reasonable jury to conclude she was the victim of discrimination under the ADA.

Claims of discrimination based on indirect evidence, as in the case at bar, are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this standard (1) the plaintiff must make a prima facie showing of discrimination (See Stansberry, above); (2) the defendant must articulate a legitimate, nondiscriminatory reason for the employment action; and (3) the plaintiff is afforded an opportunity to show the defendant's stated reason is merely pretext for discrimination. Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007). Under the McDonnell Douglas burden-shifting framework, Buffington was tasked with proving that PEC's proffered reason for termination, poor work performance culminating in a violation of the

"Use of Vehicles Policy," was pretext for the actual discriminatory reason for termination. PEC asserts that the testimony and evidence at trial was not substantial enough to convince a "reasonable" jury of pretext.

At trial the jury was charged with deciding whether Buffington's termination occurred under circumstances that would raise a reasonable inference that her son's disability was a determinative factor in her dismissal. PEC claimed a valid reason for Buffington's dismissal – the violation of the Manager's Handbook Vehicle Policy. The burden then shifted to Buffington to show that the reason provided by PEC was pretext. Buffington asserted that PEC perceived she would miss significant time from work in the future due to the deteriorating condition of her son [ECF No. 37 at 9]. Speculation of this kind would show that PEC relied on unfounded stereotypes or assumptions about the type of care Buffington would need to give her son in the future [ECF No. 37 at 9-10].

Buffington presented the following evidence at trial to prove that PEC's justifications for her dismissal, poor work performance and violation of the Use of Vehicles Policy, were pretext for the actual discriminatory reason for her termination: (1) PEC did not enforce its "Use of Vehicles Policy" against other similarly situated managers; (2) the "paper trail" amassed by the district and regional managers in anticipation of her dismissal contained language that cast doubt on PEC's stated reason for dismissal; (3) evidence of hiding the decision maker shows pretext; (4) PEC's inconsistent reasons for termination; (5) Lawrence's statements to Buffington in the 2010 review and at the termination meeting [See generally ECF No. 37].

11

PEC asserts in its Motion that it put forth evidence at trial indicating that Buffington was not performing to standards at her job and that the violation of policy was the final straw. Much of what PEC proffers in support of its Motion for Judgment as a Matter of Law and Motion for a New Trial is akin to the issues presented to this Court in PEC's Motion for Summary Judgment [ECF No. 30]. One novel issue raised in PEC's Brief was that Buffington's testimony presented at trial was incredible because it was rife with contradictions and it should be thrown out [ECF No. 132 at 85]. The credibility of testimony presented by any witness is an issue properly for the jury's consideration; the Court declines to grant the request to discard Buffington's testimony.

PEC claims that the jury could not have reasonably made the legal determination of pretext for Buffington's dismissal based on the following facts presented during trial: (1) Buffington provided no legitimate comparators, and therefore, Buffington did not prove that PEC did not enforce its "Use of Vehicles Policy" in a uniform fashion. PEC states that the memo issued to all Managers to strictly enforce the Policy changed the scenario and that only violations after that date could provide a true comparison. (2) The "paper trail" of Buffington's absences was simply good human resources practice. (3) PEC contends that it was not hiding the decision-maker. Egyed was always the person who made the decision to fire Buffington and using Lawrence's name on the PHRC paperwork was a clerical error. (4) PEC asserts its reasons for firing Buffington were not inconsistent. Buffington's poor work performance was evident in the objective statistics of her restaurant, and her violation of policy was simply more evidence of subpar work performance. (5) The statements made in Buffington's reviews and at her termination meeting were nothing more than performance critique and a compassionate "off-the-record" statement made while parting ways.

While PEC makes strong arguments for a verdict in its favor we find there was substantial evidence presented by Buffington during trial from which a reasonable jury could find in favor of the Plaintiff. Therefore, we decline to grant the Motion for Judgment as a Matter of Law and likewise find no reason to order a new trial. Issues of fact and credibility are left to the jury and absent a grave injustice a Court should not overturn a verdict.

## IV.  Jury's Award of Front Pay

Upon a jury verdict in favor of Buffington, Plaintiff sought damages including an award of front pay. The jury awarded Plaintiff front pay in the amount of One Hundred and Fifteen Thousand ($115,000) dollars. PEC challenges the jury's advisory front pay award on the grounds that it is "excessive, speculative, not based upon any record evidence, unreasonable in duration, and was not reduced to present value." [ECF No. 132 at 105]. Pursuant to Fed. R. Civ. P. 52(a)(1), "PEC requests this Honorable Court to reject the jury's advisory front pay award and to issue its own findings of fact and conclusions of law regarding plaintiff's entitlement, if any, to front pay." [ECF No. 132 at 105]. Front pay is an alternative to the equitable remedy of reinstatement, when reinstatement is not appropriate given a likelihood of continuing animosity between parties. See Donlin v. Philips Lighting North America Corp., 581 F.3d 73, 86 (3d Cir. 2009); Goss v. Exxon Office Systems Co., 747 F.2d 885, 890 (3d Cir. 1984). Front pay may be awarded "for a reasonable future period required for the victim to reestablish her rightful place in the job market." Goss, 747 F.2d at 889. A Court must avoid awarding a plaintiff a windfall. See Standley v. Chilhowee R-IV School Dist., 5 F.3d 319, 322 (8th Cir. 1993). Because an award of front pay is discretionary, it is not an abuse of discretion for a court to deny front pay where a

district court concludes that back pay was sufficient to make a plaintiff whole. See Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2nd Cir. 1993).

PEC contends that the jury calculated the award of front pay of $115,000 by multiplying $5,000 (the difference in pay between her PEC salary and her pay at her new job) by 23 years (the amount of time until Buffington reaches retirement age). PEC asserts the amount of years is unreasonable, and the calculation fails to take into account the Plaintiff's duty to mitigate damages. Furthermore, the Jury failed to reduce the advisory award to its "present day value." [ECF No. 132 at 106-07]. In other words, the Plaintiff could potentially earn interest on the award she would receive in lump sum that otherwise would have been earned over the course of 23 years [ECF No. 132 at 108]. "PEC believes that a 5% discount rate is a conservative and reasonable rate of reduction of the front pay award to present value." Id.

Buffington's response is that PEC's argument is pure speculation because there is no evidence of record to show how the Jury calculated front pay [ECF No. 138 at 65]. Plaintiff puts forth other economic theories such as inflation and future pay raises that would counter-act the "present value" theory. Id.

Evidence from an expert on damages to assist the jury with a damages calculation was sorely missed during trial. The Court now suffers the same lack of instruction to perform the calculations necessary to determine an economically sound value for Buffington's lost future pay. Nonetheless the award of $115,000 in front pay does not appear to be so outrageous to cause this Court to overturn the Jury's determination.

Front pay is an alternative to reinstatement, and front pay awards necessarily involve some level of speculation. Donline v. Philips Lighting North America Corp., 581 F.3d 73, 86, 87 (3d

Cir. 2009). "Because a claimant's work and life expectancy are pertinent factors in calculating front pay," courts will not refuse an award of front pay "merely because some prediction is necessary." Id. "It is well settled that 'the risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim.'" Bartek v. Urban Redevelopment Authority, 882 F.2d 739, 746 (3d Cir. 1989) (citing Goss v. Exxon Office Sys. Co., 747 F.2d 885, 889 (3d Cir. 1994)). The jury's award of $115,000 of front pay is not so large as to be patently excessive or constitute a windfall to plaintiff. See Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 833 (3d Cir. 1994) and Standley v. Chilhowee R-IV School District, 5 F.3d 319, 322 (8th Cir. 1993).

## V. Conclusion.

Because a reasonable jury could have concluded that Buffington was the victim of discrimination under the ADA and PHRA due to her association with her disabled son, and because we find no reason to overturn the Jury's determination of future pay, Defendant's Motion for Judgment as a Matter of Law and Motion for New Trial will be denied.

An appropriate Order follows.

June 5, 2014

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior District Court Judge